Again, whenever you wish, you know the system here, so... I do, thank you. Okay. Yes, may it please the Court, Jerry Hernandez appearing for Mr. Heiler Barrionuevo-Roblero. I would like to reserve three minutes in rebuttal, please. Keep track of your time. I'll try to help you on that. Okay, thank you. Watch your time. To get right down to the bottom line, we were completely unable to investigate anything, impeach anyone, or present any of our own evidence to the district court. All those decisions were made for us. In particular, the critical question that drove this whole calculus was what happened in that stash house. And we would have liked to have questioned some of those deported witnesses with respect to what happened, the relationship between David Perez-Hovell and Heiler Barrionuevo. And, of course, we weren't able to do that because none of those people were available when I got appointed to the case. Now, what really compounded that was, as we got down the pike after we pled straight up to the court, in the pre-sentence investigation, the case agent told the pre-sentence report that it was Mr. Barrionuevo that orchestrated the movement of all these witnesses that made all these decisions about what went on in the stash house, and the problem is, is that's contradicted by the evidence we have in the grand jury testimony. So that was another setback in terms of what we were able to present to the court and how we were able to be persuasive to the court. Could you describe what the exact contradiction is, please? I can, yes. On July 9th, 2013, Agent Johnson, under oath, testified that David Perez-Hovell coordinated the drivers, David Perez-Hovell coordinated the movement of aliens, and David Perez-Hovell handled the money. And then to the ---- But isn't it possible that two people were doing those tasks? It's not impossible, but we know from the investigation and the testimony, the grand jury, that David Perez-Hovell was the bag man. He was the one that got the money from all these people, the laundered money from the banks. He was the guy that collected it. There was no evidence from any quarter suggesting that Mr. Barrio Nuevo ever had access to funds or was ever observed. Counsel, is that accurate? I thought there was a substantial amount of testimony that he was collecting fees from people. Is that not correct? And asking families for money and threatening families. That was ---- there is that ---- those statements from the witnesses the government paroled into the country, but we don't know how he would have done that because he was never observed. That money was wired into a bank account. And ---- Counsel, let's assume that there was sufficient evidence that he managed the aliens in the house themselves, and I think the evidence, frankly, was ample on that score, collecting the money and taking care of the feeding and all that. But is that sufficient for an enhancement for being a manager, organizer of the offense? Because I'm not aware of any case indicating that aliens in a statute are deemed to be participants in the commission of a crime. And as I read the guidelines, that's what's required for that sentencing enhancement. Are you aware of any cases that stand for that proposition? I'm not aware of any cases that stand for that proposition. And we argued vigorously to the trial court that the standard under the guidelines and your own precedent is that he have to manage or supervise someone. Does that answer your question? Not just someone. A participant in the commission of the offense, right? Yes. Correct. And so was there evidence in the record that he managed another participant in the offense? We don't know of any. No. No, there isn't. I want to ask you about, you started your statement talking about your inability to question people who have been removed. Do you agree that the U.S. versus Leal del Carmen is the standard by which you get to, if you will, overcome what the government did from your perspective? There's a two-prong test you have to meet under that case, right? Yes, I think that... And those prongs are, number one, you have to show that the government acted in bad faith, and secondly, you have to demonstrate that the deportation of the witness has prejudiced your case. Yes. In what way have you met the first prong? Do you have any evidence at all that shows that the government acted in bad faith? We think that the we know that they were monitoring this stash house for over a month, and we know that the witnesses that they paroled into the country had been in the house eight or nine days. And so we don't think that it is unreasonable to assume that other witnesses may have been there a little bit longer. And those are assumptions. Do you have any evidence? I don't. Government. Okay. I don't. So that's the first prong. What about the second prong? In what way was your case prejudiced? We were prejudiced because we were not able to present evidence that would have impeached what the material witnesses said or present our own evidence with respect to the critical question of role. But I thought that the ones that you got to talk to, or that at least that's my impression, did not contradict the other witnesses in any material aspect about this. So in what way would these people have changed the outcome of the case? If we could have asked them, for example, how long were you in that stash house? I was there eight or nine days. What did you see Mr. Barrio Nuevo do? He cooked and he cleaned. Did you ever see him collect any money? Did you ever see him call anyone? No. Well, that's your position. Do you have any evidence that that's what they would say? No. Okay. It's all speculation, isn't it? It is. Okay. So bottom line is, in terms of these people having been removed, it seems to me that you have a problem in satisfying the requirements of the Leal del Carmen case. So I guess what I struggle with here is, aside from the sentencing issues raised by my colleague, it seems like there were lots of witnesses, people who were in the stash house, who had fees requested by them, who told them to get in the vehicle in particular ways that were highly dangerous and so on. Now, you might say, well, maybe some of those people thought it was really a great way to travel and it wasn't dangerous at all. But the reality is there was testimony in this case sufficient to make out the elements of the crime charge, were there not? Putting aside the sentencing issue for a moment. If I understand your question, it's certainly there was enough evidence to prove the crime charge. That's — And that's — We pled guilty to that. All right. Okay. The real question was — and these are — these are difficult questions. We're put in a position of having to answer very difficult questions like the ones the Court is asking because we ourselves could not question any of these people. So when the Court talks about, well, there was substantial evidence — You could question them when they gave testimony, right? I'm sorry, sir? You could question whatever testimony they gave, couldn't you? You can impeach that if it's wrong? Well, there was no way to do that in this case. We didn't get to do any material witness depositions. These people were gone. So the best we can do is draw inferences based on what we know. I — perhaps I'm mistaken. Counsel, correct me if I'm wrong. I understand that some people were removed. But I thought there were a number of people who were still there, still in the States, and could have — could have been questioned by you. Is that — am I mistaken about that? There were four people paroled into the country, three of whom — one of whom absconded because he had a criminal history agents at the time did not — were not aware of. Okay. And he was — would have been deported, and he figured that out and skedaddled. Okay. There was three other witnesses that the government paroled into the country. We were never — they — we never asked, but they were never made available, and they never testified at the suppression hearing, the evidentiary hearing. So we never questioned them. They never testified. But you didn't ask to talk to them. I didn't ask to talk to them. So how does that work, then? Admittedly, if you have an opportunity to cross-examine and impeach somebody's testimony, that's helpful, or at least to get the information so you could get it before the decider. But in this case, you didn't even ask to talk to them. So how can we fault the government for having removed some other people? Because if they'd been in the States, maybe you wouldn't have asked to talk to them either. Well, we would have. The normal course in the trial court is they don't have to make those witnesses available to us. And as a general day-in and day-out, they don't. And the — what we normally do in immigration cases is witnesses are paroled — are brought in, they're deported afterwards, and everyone has a chance at a material witness deposition to talk to them. That wasn't done in this case. They were just paroled directly in, so we didn't have the right to depose them under the rules. I'm sorry. I thought you just said that there were three people that were paroled in the U.S. that did not abscond. Right. And I thought you also said that you made no effort to try to talk to them. That's true. At the very least, that may have had some bearing on the sentencing, maybe. What do you think? It might have. So if you found — if you had some evidence from them that showed that they misrepresented what they saw your client do, then you could bring that before the sentencing judge and say, you know, yeah, I know you've got this testimony, but we did this deposition, and, you know, this is what they say. It's just not the same. But you didn't do that. Correct. So under the circumstances, kind of hard to fault the government for that, isn't it? In respect to that particular issue, it is. I sent, in one of my excerpts of record, a tabulation of all the witnesses, what they said, what they didn't say. And we tried the best we could to impeach what the paroled witnesses said by showing the Court in our little tablet there, the only witnesses that said these things were the ones they paroled in. They didn't — the other ones never said anything about these things, or they weren't asked. I've taken you over time, and we'll give you a minute in rebuttal, but let's hear from you. That went quickly. Sorry. May it please the Court. Good morning. I'm Kristen Brook from the District of Arizona, representing the FLE, the United States. The defendant argues on appeal constitutional issues that were waived by this Court's decision in United States v. Jackson. Additionally, he erroneously attempts to apply Leal del Carmen to a sentencing context where this Court has not applied Leal del Carmen. In Jackson, this Court held that a defendant waives his constitutional violations or rights to make constitutional arguments or antecedent constitutional defects when he enters into an unconditional plea of guilty, with or without an actual plea agreement. He can plea to the indictment. And in that holding, in that case, the Court cited Tollett v. Henderson. In Tollett v. Henderson, Chief Justice Rehnquist particularly articulated an analogy with a change of plea. And he said that a change of plea was analogous to a break in a chain of events in a criminal proceeding. And the Court went on to state that when a criminal defendant has solemnly admitted an open court, the facts underlining their offense that he is charged with, that he may not thereafter raise independent claims relating to deprivation of constitutional rights that occurred prior in time to that entry of guilt, to his solemnly admitting an open court that he is, in fact, guilty. I know that defense also filed a 28-J letter stating that this particular issue may have been waived. And on that point, the government just wants to articulate that this is a pure issue of law. And as a pure issue of law, it's only waived if there is not an underlining factual or an underlying prejudice to the defendant. And there's not because there's no factual dispute. It's not disputed that the defendant pled unconditionally, and he pled guilty in this particular case. So therefore, the Court's, this Court, finding that, in fact, this is a pure issue of law. And we need to reach this question about whether Jackson applies here if we think that he hasn't met his burden of showing that there actually was exculpatory evidence from these witnesses, do we? Correct. And what is the standard of review for us when we're reviewing the district court's conclusion that there was no exculpatory evidence, or that he didn't show any? Clear. Because we should consider that a factual determination, or because is there a legal component to the determination that the district court made? Well, the district court did make a finding, in fact, here in this particular case, and found that there was no evidence of any potentially exculpatory or exculpatory evidence on behalf of the four witnesses that the defendant's talking about. Additionally, the district court found that the officers had engaged in reasonable investigative procedures, and therefore, there was no bad faith.  The government, as well as the district court's analysis, relied heavily, and then the briefing on appeal, too, frankly, relied heavily on the fact that the defendant managed the house where the aliens were. But as I read the guidelines, to qualify for that adjustment, the defendant has to have organized or supervised or managed one or more participants defined as people who actually participated in the commission of the offense. Can you point to evidence in the record that supports a finding that the defendant supervised other participants in the crime? Yes, Your Honor. And specifically, just to highlight the 3B1.1 subsection B, it does state that there needs to be a criminally responsible participant to whom the defendant managed or supervised. With that, the record in this case shows that there's sufficient evidence to support a role adjustment for the defendant's role as a manager supervisor, in that the record reflects that the court intended an upward departure or a variance. Well, that — and you get to my next question, actually, because I didn't really identify evidence in the record that really supports the notion that he managed other participants. Now, the question is whether an upward departure is warranted, and it may very well be, in fact, the guidelines provide for an upward departure where the defendant had some managerial responsibilities but didn't manage other participants. But upward departures under the guidelines is not the same as offense-level enhancements. And so here, the Court applied an enhancement, right? Is your argument, then, that the facts in this case support the enhancement or that they support an upward departure, in which case we'd have to send it back for resentencing, I would think? The record, as you look at the district court's language, does not state that she referred to it as an enhancement. Her language was an upward adjustment. And specifically, Your Honor makes reference to Application Note 2, which refers to situations where an upward departure may be warranted without there being the identification of a participant. The record does not identify the district court pointing to one particular person to whom the defendant managed or supervised specifically. But with that said, the record does support such a finding. PSR Paragraph Number 7 refers to Tomas Velasquez, one of the co-defendants in this case. He specifically mentions how the defendant gave him $200 to go purchase a cell phone as part of his duties. Additionally, he mentions that when they arrived at the house that morning on January 9th, that it was this defendant who directed the aliens out of the house and into the van. Martinez. But can we affirm on the basis that the court could have found that, or do we need to remand for the district court to make such a finding? The factual findings can support that she intended there to be an upward departure or a variance and not an enhancement based upon her language in the record, and therefore, the court could affirm based upon the record. Additionally, the court made significant factual findings in regards to 3553 factors articulating what factors were applicable for this particular defendant and delineating the fact that she found this defendant to be more culpable than the other four individuals who she had sentenced in this organization, and that he was going to receive a 12-month increase in his sentence over the other four based on his higher degree of responsibility and culpability. In finding him such, she sentenced him to 42 months, which was below the guideline application range. And she did it according to the 3553 factors that she articulated. Kennedy. Counsel, I would be grateful if you would answer the specific question that Judge Wynn asked you a few minutes ago. Specifically, is there any evidence in the record that shows that your or that the charged defendant here supervised others in the Stash House? I mean, not the aliens that were brought in, but rather others as part of the enterprise. Yes, Your Honor. About a cell phone a minute ago. Anything besides that? So, yes. So the defendant was in the Stash House. He was solely responsible for it. The others were in drop houses or apartments at other locations. However, the PSR paragraph number 7 does refer to the money being given for the cell  And it reveals, when somebody who is responsible for money is giving money to another participant in the organization with the intent to purchase something, that being a cell phone. So, is that it? In other words, he gave money to somebody to get a cell phone, presumably to help him. I mean, how do we know he wasn't calling for groceries or a movie? The record doesn't reflect that they had any knowledge or contextual understanding of each other beyond the specific confines of this organization. Additionally, Velazquez-Thomas was newer to the organization. He had done one run before, and this was his second. So, in terms of directly directing other participants, that, as well as directing the aliens out of the house to the aliens, that's managing the activities of the organization, which may, under the guidelines, warrant an upward departure. But I don't think that that's what the district court did in this case. That's correct. So, based upon the upward departure language and what the court found, as Your Honors have mentioned, that the defendant organized the transportation of the aliens, he was the caretaker of the stash house, all of these different facets of the organization that he was responsible solely for the house, a large house, one that had, you know, 30 aliens that were just departing that particular day for other locations. Sotomayor, since your time is running very short, have you quickly addressed Amendment 775 and its impact on the third point for acceptance of responsibility? Yes, Your Honor. I just want to highlight the fact that there's no evidence in the record to reflect the fact that the government did not move for acceptance of responsibility for an unconditional or an unconstitutional motive or for any arbitrary reason. That the district court also made the case that the government's motion for the third point should be based on resources, conserving resources. Yes. And in that, when an individual accepts full responsibility for what they have done, a defendant will create a circumstance where they have fully accounted for the criminal conduct that they're responsible for. In fully accounting for the criminal conduct, it precludes them from making arguments such as the one that we're here for today, because they've been fully accustomed. Does the government in this case have to expend any additional resources in preparing for trial because the defendant didn't plead in a timely fashion, anything like that? Did the government spend extra resources? Yes. Expend any extra resources in preparing for trial? Because he didn't fully — Because he didn't accept the plea early or he delayed unreasonably. Is there any evidence of that in the record? He — he entered into a plea of guilt, which was about 10 days roughly, before trial was set in this particular case. So the government was, you know, anticipating that there was to be trial. Additionally, at sentencing — Did the government ever argue that the third level was denied because he pled guilty so late in the process, and so the government had to prepare for trial? The government did not argue that on the record, so the district court, no. Any other questions from my colleagues? Thank you very much, Zinn. We appreciate your presentation. Thank you. We'll give your distinguished colleague here a minute, because we took him over before. Thank you. Just to summarize, you've asked some tough questions. Some of those questions I would like to have asked some of the people in that stash house and couldn't. Particularly that — that issue about the cell phone came up. I would just like to supplement the line of questions that followed. There's no connection in the record anywhere. He may have been calling his girlfriend with that phone. He may have been given that money by David Perez-Havel. It's important to remember that David Perez-Havel was in that house every day, including the morning that the bust went down. So I'm trying to express a sense of frustration is that we weren't able to do a lot of things to — to present to the district court. We were given a tile scrabble with the letters given to us and said, spell this word. Those letters weren't in the tiles we were given. So that's a problem that we had. And thank you. Thank you very much. We appreciate it. The case just argued is submitted.
judges: Smith, Nguyen, Friedland